UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**D.P. DOUGH FRANCHISING, LLC,**

        **Plaintiff,**

    **v.**

**EDWARD SOUTHWORTH, et al.,**

        **Defendants.**

**Case No. 2:15-cv-2635**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION & ORDER

This matter is before the Court for consideration of Plaintiff's Motion for Preliminary Injunction (ECF No. 4), which the Court previously consolidated with the final adjudication on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. After consideration of the parties' submissions, the admissible evidence, and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. For the reasons that follow, Plaintiff's Motion is **DENIED**.

## I.    FINDINGS OF FACT

The following facts were undisputed or were established by a preponderance of the evidence.

### A.  Factual Background

This case arises out of a dispute between Plaintiff, D.P. Dough Franchising, LLC ("D.P. Dough"), and Defendants, former D.P. Dough franchise owner Edward Southworth and his company Doughmination, LLC (collectively "Defendants"), both of which operate late-night calzone restaurants near college campuses. (Transcript of Preliminary Injunction Hearing ("Tr.") at 16, ECF No. 44.)

D.P. Dough was founded in 1987 and is a national franchise with approximately twenty-four restaurants near large colleges and universities across the country. (Tr. at 18, 20.) D.P.

Dough restaurants are primarily known for selling calzones, their late-night hours, and delivery service. Plaintiff and current owner of the D.P. Dough franchise purchased the brand and goodwill from its founder in 2011 for more than $750,000. (*Id.*) Matthew Crumpton is the current President and CEO of D.P. Dough Franchising, LLC, the Plaintiff herein. (Declaration of Matthew Crumpton ("Crumpton Decl.") ¶ 2, ECF No. 4-1.)

According to Crumpton, the D.P. Dough brand is reflected in several key themes such as the black and red block logo, its student customer base, offering late-night delivery, having a large chalkboard wall listing the "Zone of the day", using a white box and bag, offering a Free Calzone Day, and use of slogans such as "Open Crazy Late" and "the original calzone company." (*Id.* at 32–37.) Plaintiff has registered copyrights for the text in its LinkedIn profile and the photographs and text in the menu used by the D.P. Dough restaurant in Raleigh, North Carolina. (Copyright Registration Nos. TXu 1-946,407 and VAu 1-212-004, ECF No. 1-2.) Plaintiff also has registered trademarks for its logo and certain terms used as part of its brand, particularly the use of the word "zone" in describing its calzones. (Tr. at 21–25, 30–32; Compl. ¶ 64 (listing various registered trademarks).) Current franchise owners are provided with copies of D.P. Dough copyrighted and other confidential materials through a secure intranet site, which was established in early 2014. (Tr. at 41.)

Defendant Southworth began working at D.P. Dough in 2007 as a delivery driver for the Cortland, New York location. (*Id.* at 212.) He became a Manager in 2010 and later purchased the restaurant in September 2011, which he operated until December 31, 2013. (*Id.* at 171, 216.) Southworth did not previously own any other restaurants. (Defendants' Answer ¶ 15, ECF No. 24.) When Southworth purchased the restaurant, he did not sign a non-disclosure agreement and was not told that any information was confidential. (Tr. at 212.) Southworth testified that as a

Manager and Owner, he created several marketing campaigns, such as the "Two for Ten Tuesday" and offering a free calzone to customers on their birthdays. Southworth also testified that he created the idea of a Free Calzone Day to help with publicity. (*Id.* at 218–19.)

Southworth attended two ownership conferences for D.P. Dough franchise owners in July 2012 and July 2013, at which D.P. Dough provided various documents to Southworth, including portions of its new operating manual. (*Id.* at 173.) The D.P. Dough operating manual consists of approximately 150 pages the D.P. Dough executive team compiled outlining operational information and best practices in running a D.P. Dough restaurant. (*Id.* at 50.) Crumpton testified that he later emailed Southworth with a link to the remainder of the operating agreement. (*Id.* at 47.) Southworth denies having ever read the operating manual and testified that he did not take any of the provided documents back to the Cortland restaurant. (*Id.* at 176.)[1] Crumpton alleges that Southworth signed a non-disclosure agreement at the July 2012 conference. He could not, however, how find a copy in his records and Southworth does not recall signing such an agreement. (*Id.* at 128.)

Crumpton also testified that Southworth was provided written recipes at some point, but could not recall if the recipes were distributed at the 2012 conference or later. (*Id.* at 129–30.) Prior to that time, written recipes were not provided to D.P. Dough franchise owners but instead were communicated to the owners verbally. (*Id.* at 125.) Most of the calzone recipes are posted

---

[1] Q So, you never had the training manual that D.P. Dough gave you at either ownership conference at the Cortland store?
A Yeah, and I took nothing home. I took no advantage of training from D.P. Dough.
Q So, my question was, did you have those training manuals at the store? Were there training manuals at D.P. Dough at your store?
A No.
Q Were there ever an operating manual at the store?
A No.
Q You never received one?
A I have never seen one.

(Southworth Testimony, Tr. at 176.)

on the walls or make-tables of most D.P. Dough restaurants. Employees who view these recipes are not required to sign a non-disclosure agreement. (*Id.* at 134.)

Although Southworth was a franchisee as of 2011, he did not sign a franchise agreement with Plaintiff until September 2013 because D.P. Dough's former owner had not registered the company as a franchisor in New York. (Tr. at 45, 50.) After Plaintiff was ultimately approved by the State of New York as a franchisor, D.P. Dough and Southworth executed a Franchise Agreement on September 26, 2013. (*Id.* at 45–47.) Southworth testified that he agreed to enter into the Franchise Agreement so that he could pursue ownership of another franchise. The Franchise Agreement included a non-competition and non-diversion provision. (Franchise Agreement ("Franchise Agr."), ECF No. 1-1.) Those provisions are as follows:

**14. Covenants.**

    **A.** Franchisee shall not, without the prior written consent of D.P. Dough Franchising, directly or indirectly (each of the following obligations is also secured by the Personal Guaranty, if applicable, as attached as Attachment C and fully incorporated herein):

    . . .

    **ii.** For a period of three (3) years following the expiration, termination, or transfer of this Agreement, regardless of the cause of such expiration, termination or transfer, engage in the operation of a Competing Restaurant within sixty (60) miles of (a) the Restaurant, or (b) any D.P. Dough Restaurant.

    **iii.** During the term of this Agreement and for a period of three (3) years after its expiration, termination, or transfer, regardless of the cause of such expiration, termination, or transfer, divert or attempt to divert any business or customer from any D.P. Dough restaurant.

(*Id.* ¶ 14(A)(i)–(iii).) The agreement also contains a non-disclosure provision as follows:

    C. Franchisee acknowledges that all standards and policies established by D.P. Dough Franchising and all information related to the System is confidential and proprietary information belonging to D.P. Dough Franchising. Franchisee shall not use any such information or disclose any such information to any third party, either while this Agreement is in effect or following its termination or expiration, except as expressly permitted in this Agreement. Franchisee shall use

> its best efforts to protect the confidentiality of such information from appropriation by its employees.

(*Id.* ¶ 2(C).) The "System" is described as a "unique style of restaurant operation for the sale of food products and beverages of uniform quality." (*Id.* ¶2(A).)

Southworth began discussions with D.P. Dough to open a new location in Columbia, South Carolina around the same time he signed the Franchise Agreement. (Tr. at 179.) However, Southworth was also considering opening a franchise restaurant of his own, partly so that he would not have to pay a franchise fee or royalties to D.P. Dough. (*Id.* at 174, 187.) According to Crumpton, the fee to open a new franchise at the time was $25,000 and royalties thereafter were four percent of net sales. (*Id.* at 56.) Crumpton testified that as part of these discussions, D.P. Dough provided Southworth with a "new opening store checklist" outlining the steps a franchisee would take to open a new location. (*Id.* at 53.) Crumpton testified that he learned Southworth had made representations to an equipment leasing company indicating that he wanted to lease new equipment for his Cortland restaurant, when Southworth really intended to use it in his new Columbia location. (*Id.* at 72–73.) When Crumpton confronted Southworth about this misrepresentation, Southworth apparently ceased all communications with Plaintiff. (*Id.*) According to Southworth, the parties had a fundamental disagreement about certain operational choices, such as the decision to use certain frozen ingredients over fresh, and that once of his last conversations with Plaintiff's leadership concerned this dispute. (*Id.* at 229.)

Shortly thereafter, in December 2013, Southworth transferred ownership of the Cortland D.P. Dough to his mother, Bonnie Quackenbush. (*Id.* at 66–67.) Crumpton testified that while Quackenbush had access to the D.P. Dough intranet as a franchise owner, there is no evidence of whether she actually accessed it. Since the intranet was established after Southworth transferred ownership to his mother, there is also no evidence that Southworth accessed any confidential

materials from the D.P. Dough intranet either directly or through his mother. D.P. Dough and Quackenbush mutually terminated their franchise agreement in June 2014, after which the Cortland location was closed and not reopened. (*Id.* at 67.) Quackenbush agreed to not to share any confidential D.P. Dough information with her son and to destroy all D.P. Dough records after her relationship with the company terminated. (*Id.* at 138.)

In March 2014, Southworth opened Fast Eddie's Calzones (later renamed as "Eddie's Calzones") in Columbia, South Carolina. (*Id.* at 186.) Plaintiff did not end up opening a D.P. Dough in Columbia and currently has no presence there. (*Id.* at 89.) Among the differences between Eddie's Calzones and D.P. Dough include: the types and names of calzones; D.P. Dough's sale of other food items besides calzones; and various differences among ingredients and recipes. For example, Eddie's Calzones makes its dough fresh in stores whereas D.P. Dough has its dough made and frozen and then sent to the franchisees (at least at the time of the hearing). (*Id.* at 142, 238–39, 250.) As to their similarties, both restaurants offer calzones, late hours, delivery, and cater to college campuses. According to the Eddie's Calzones website and photos, the restaurant also has a chalkboard with the company's logo and calzone of the day, similar to those in D.P Dough restaurants. (*Id.* at 83.)

Eddie's Calzones' first menu was also noticeably similar to the menu used by the Raleigh, North Carolina D.P. Dough. Southworth testified that the year prior to opening Eddie's Calzones, in July 2013, he received a template of the Raleigh D.P. Dough menu from Raleigh owner Rick Lounsberry. (Tr. at 178; Lounsberry Email, ECF No. 38-1.) The Raleigh location is the only D.P. Dough restaurant that used this particular menu design at the time, which is different than the corporate D.P. Dough menu. (Tr. at 113, 165.) Lounsberry owned the copyright to the menu at the time he shared it with Southworth, but later transferred the

copyright to Plaintiff. (*Id.* at 119.) Southworth testified that although Lounsberry did not give him explicit permission to use the menu beyond the scope of his role as a D.P. Dough franchisee, he was not told he could not use it otherwise. (*Id.* at 178–79.) Southworth testified that he and Rick were friends and that Rick shared the menu because Southworth had helped his business in the past. (*Id.* at 221–22.)

Southworth testified that he created the Eddie's Calzones menu by editing the Raleigh D.P. Dough template to change the names of the calzones, add his logo, and make other minor edits such as moving the phone number. (*Id.* at 188–89.) Southworth also concedes that he retained certain phrases from the D.P. Dough menu such as "spinner" for spinach, and "roni and shroom" for pepperoni and mushroom, but otherwise did not use any of D.P. Dough's trademark phrases such as "Open crazy late" or "zone out." (*Id.* at 121, 189–90.)

However, Eddie's Calzones no longer uses this menu design. Southworth created a new menu after Plaintiff initiated this suit alerting Southworth to the potential infringement of its first menu. (*Id.* at 191–92.) The design of the new menu has a different orientation and style, though the calzone names and ingredients listed remain the same. (*Id.* at 192.) Defendants have also removed any allegedly infringing photographs online, which Plaintiff confirms. ("So, yes, to your question, these images of this infringing calzone image have been changed to a non-infringing image at this point." Crumpton Testimony, Tr. at 150.)

Crumpton testified that he first learned about Southworth opening Fast Eddie's in Columbia from Dan Harlett, VP of Training, who told him in April 2014. (Tr. at 74.) Harlett had learned about it when the Raleigh D.P. Dough store owner (presumably Lounsberry) told him about Southworth's new restaurant. (*Id.*) Crumpton attempted to search online for the new restaurant but could not find anything and did not have the resources to personally investigate the

news further. (*Id.* at 75.)[2] The next communication between Southworth and Crumpton took place on April 26, 2015 when Southworth emailed Crumpton about his opening a second Eddie's Calzones in Athens, Georgia. (Tr. at 75–76.)

Plaintiff had previously executed a franchise agreement with Bulldawg Dough, LLC ("Bulldawg") in February 2014 to open a D.P. Dough in Athens, Georgia. (Tr. at 76.) By February 2015, Bulldawg had secured financing and entered into a letter of intent with the owner of real estate space at 265 E. Clayton Street for the restaurant. (*Id.*) However, before Bulldawg could finalize an agreement to lease the space, Southworth bid on and secured the Clayton Street property for Eddie's Calzones. (*Id.*) Southworth stated in his April 2015 email to Crumpton that he had won the "bidding war" with Bulldawg for the same location. Crumpton took Southworth's use of the word "bidding war" to presume that he knew D.P. Dough had intended to open an Athens location.

Crumpton also testified that Southworth would have known D.P. Dough was looking to open an Athens location because he knew that D.P. Dough was interested in opening a restaurant at every college campus. (*Id.* at 77.) Crumpton testified that this is supported by the public D.P. Dough website, which displays a map of the United States to prospective franchisees indicating all the cities that are available for franchisees to open a new restaurant. (*Id.*) Crumpton testified that as of March 2014, D.P. Dough would have listed Athens, Georgia as a franchise "in development" on its public-facing website. (*Id.* at 152–53.) Southworth denies having known

---

[2] Crumpton was asked why he did not look into the matter further if he was truly concerned:
Q. Did you investigate at all?
A. No.
Q. Why not?
A. Because Ed is not good at stuff, and he's undercapitalized, and I didn't think there was any possible way he could stay open. And additionally that it just -- I didn't have time. It wasn't a priority. . . . I was just aware that he was open. That's it. It was not a concern.

(Crumpton Deposition at 100, Hearing Ex. C, ECF No. 40.)

about Plaintiff's plans to open a D.P. Dough in Athens prior to Southworth pursuing the city for his second restaurant. Alternatively, there is also evidence that Southworth was using the same real estate agent in Athens that Bulldawg used. According to Crumpton, the real estate agent "told [Southworth] that a national calzone franchise was looking at the location." (*Id.* at 109.) Southworth recounts a similar story, and testified that he did not learn about D.P. Dough's interest in the property until after he already signed the lease. (*Id.* at 237.) After Southworth secured the Clayton Street location, Bulldawg was compelled to secure a less desirable location nearby.

### B. Procedural Background

D.P. Dough initiated this suit against Defendants in July 2015 and sought a preliminary injunction. (ECF No. 4.) Plaintiff's Verified Complaint asserts claims for trademark and trade dress infringement, breach of contract, misappropriation of trade secrets, copyright infringement, deceptive practices, unfair competition, tortious interference, and unjust enrichment. (Complaint ("Compl."), ECF No. 1.) This case was originally assigned to Judge Graham, who held a preliminary injunction hearing on November 4, 2015, at which both Crumpton and Southworth testified. The parties agreed with Judge Graham that consolidation of Plaintiff's requests for preliminary and permanent injunctive relief was appropriate pursuant to Federal Rule of Civil Procedure 65(a) by way of a final adjudication on the merits. (ECF No. 42.) *See Barden Detroit Casino, L.L.C. v. City of Detroit*, 230 F.3d 848, 853 (6th Cir. 2000) (reviewing district court's factual findings for clear error and conclusions of law de novo where district court consolidated request for preliminary injunction it with final hearing on the merits). The Court ordered the parties to submit post-hearing briefs raising any additional arguments and to specifically address whether a non-diversion of business clause can be construed to impose a greater restraint on competition than what a non-competition provision may impose under Ohio law. (ECF No. 37.)

9

The parties subsequently submitted post-hearing briefs on November 6, 2015. (ECF Nos. 38, 39.)

However before the Court could issue a decision, Magistrate Judge Terence P. Kemp held a settlement conference on December 3, 2015 at which the parties reached an initial agreement. (*See* Agreement Reached Pursuant to Mediation ("Agreement"), ECF No. 51-2.) Under the terms of the agreement, Defendants agreed to certain restrictions for opening new restaurants, promised not to interfere with the grand opening of the D.P. Dough in Athens, Georgia, and to not use any of Plaintiff's copyrights, trademarks, trade dress, or "recipes or derivatives of the same." (Agreement ¶ 1–2.) The parties exchanged several drafts of a longer form settlement agreement by email, but ultimately reached an impasse over the definition of the term "derivatives" in the agreement. (*See* ECF No. 55-1.)

On February 4, 2016, D.P. Dough filed a Motion to Enforce the Settlement Agreement and to Enter Order for Permanent Injunction. (ECF No. 51.) Upon transfer from Judge Graham, this Court facilitated mediation to resolve the disputed term, but the parties could not reach a final agreement. Shortly thereafter, the Court denied Plaintiff's Motion to Enforce the Settlement Agreement finding that the parties had not reached a meeting of the minds with respect to the term "recipes or derivatives of the same." (ECF No. 61.) The Court notified the parties that it would rule on Plaintiff's Motion for a Preliminary Injunction from the existing record unless the parties requested supplemental briefing. Neither party has requested additional briefing, so this matter is now before the Court for a final adjudication on the merits from the existing record, consisting of the transcript from the preliminary injunction hearing and parties' briefs and exhibits.

## II.     CONCLUSIONS OF LAW

The decision whether or not to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure falls within the sound discretion of the district court. *Friendship*

*Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). In deciding whether to issue a preliminary injunction the Court must consider "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent [relief], (3) whether granting the [relief] would cause substantial harm to others, and (4) whether the public interest would be served by granting the [relief]." *Ne. Ohio Coal. for Homeless & Serv. Emp. Intern. Union, Local 1199*, 467 F.3d 999, 1009 (6th Cir. 2006).

"[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (internal quotations omitted). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.* A stronger showing of likelihood of success is required as the other factors militate against granting relief, but less likelihood of success is required when they support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1385–86 (6th Cir. 1995).

Under Rule 65(a)(2), the court may in appropriate circumstances consolidate the request for a preliminary injunction with a final hearing on the merits of the issues raised by the motion for injunctive relief. *See Barden Detroit Casino, L.L.C. v. City of Detroit*, 230 F.3d 848, 853 (6th Cir. 2000). The standard for a permanent injunction is essentially the same as that for a preliminary injunction except that a plaintiff must prove actual success on the merits rather than a likelihood of success on the merits. *Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, No. 1:15-CV-170, 2016 WL 5341797, at *8 (S.D. Ohio Sept. 23, 2016) (citing *ACLU of Ky. V. McCreary Cty.*, 607 F.3d 439, 445 (6th Cir. 2010)).

## A. Likelihood of Success on the Merits

Plaintiff alleges claims against Defendants for breach of contract, misappropriation of

trade secrets, copyright infringement, trademark infringement, trade dress infringement, deceptive and unfair trade practices under Ohio Revised Code § 4165.02, unfair competition, tortious interference, and unjust enrichment. (Plaintiff's Motion for Preliminary Injunction ("Mot. Prelim. Inj.") at 1, ECF No. 4.) Accordingly, the Court must consider Plaintiff's likelihood of success on each of these claims.

1. Breach of the Franchise Agreement

Plaintiff brings a claim against Defendant for breach of the parties' Franchise Agreement, which includes a non-competition clause, a diversion of business clause, and other terms regarding D.P. Dough's trade secrets and intellectual property rights. The Franchise Agreement is governed by Ohio law. (Franchise Agr. ¶ 23.) To prove a breach of contract under Ohio law, a party must prove four elements: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). A covenant not to compete, "which imposes unreasonable restrictions upon an employee[,] will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant restraining an employee from competing with his [or her] former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 25–26 (1975).

a. *Validity of the Franchise Agreement*

Defendants briefly argue that the Franchise Agreement is invalid because Plaintiff failed to provide Southworth with a franchise disclosure document pursuant to Ohio Revised Code § 1334.02 and because the agreement does not contain cancellation language as required by § 1334.06. (Defendants' Post-Hearing Brief ("Defs. Post-Hear. Br.") at 4, ECF No. 38.)

Crumpton's testimony affirms that Southworth was not provided with a franchise disclosure document and that the agreement did not contain language regarding cancellation. (Tr. at 153.) However, Plaintiff contends that Defendants raised this argument for the first time at the November 4, 2015 hearing, and that even so, Plaintiff is exempt from the both requirements according to Ohio Rev. Code §§ 1334.12 and 1334.13. (Plaintiff's Post-Hearing Brief ("Pl. Post-Hear. Br.") at 22, ECF No. 39.) Although Plaintiff does not specify which particular sub-provision exempts them from the disclosure requirement, § 1334.12(I) appears to apply. Section 1334.12 provides that "Sections 1334.01 to 1334.15 of the Revised Code do not apply to: . . . (I) The sale of a business which for at least six months previous to the sale has: . . . (1) Been operated from a given specific location; (2) Been open for business to the general public; (3) Had all equipment and supplies necessary for operating the business located at the specific location." Ohio Rev. Code § 1334.12(I). Southworth had been operating the Cortland D.P. Dough location for more than two years before he signed the Franchise Agreement with Plaintiff, and thus the disclosure requirements do not apply.

b. *Scope of the Non-Diversion Clause*

With respect to the non-disclosure provision in the Franchise Agreement, Judge Graham posed the following questions for the parties to address in their post-hearing briefs:

> [U]nder Ohio law, can a non-diversion of business clause be construed to impose a greater restraint on competition than what a non-competition provision may impose[?] Namely, where a non-compete clause either does not apply or cannot be enforced as to the defendant's conduct, can a non-diversion clause be used to effectively prohibit competition by the defendant, without regard to geographic scope? . . . [I]f Ohio law would treat such a non-diversion clause as unreasonable, is the clause unenforceable or may the court tailor limitations to make it reasonable[?]

(Order, ECF No. 37 (citations omitted).) The Court agrees with both parties that a non-diversion of business clause under Ohio law is akin to other restrictive covenant and thus construed under

the same standard of reasonableness as a non-competition or, more closely related, a non-solicitation clause. *See Extine v. Williamson Midwest, Inc.*, 200 N.E.2d 297, 300 (Ohio 1964); *Klaus v. Hilb, Rogal & Hamilton Cty. of Ohio*, 437 F. Supp. 2d 706, 732–34 (S.D. Ohio 2006). If a non-diversion of business clause is found to be unreasonable under Ohio law, it is within a Court's discretion to tailor limitations to make it reasonable. *Rogers v. Runfola & Associates, Inc.*, 565 N.E.2d 540, 543 (1991). Thus, the Court will analyze the Franchise Agreement's non-diversion of business and the non-competition clauses together under the standards set forth in *Raimonde* and *Rogers*.

    c.   *Reasonableness of the Non-Diversion and Non-Competition Clauses*

Here, the non-diversion provision restricts Southworth from "divert[ing] or attempt[ing] to divert any business or customer from any D.P. Dough restaurant" for a period of three years after termination of the Franchise Agreement, and does not contain any limitations as to geographic scope. (Franchise Agr. ¶ 13(A)(iii).) As Plaintiff points out, the Ohio Supreme Court has upheld a non-diversion of business clause without a geographic scope. *Extine*, 200 N.E.2d at 300 (upholding two-year non-diversion clause with no geographic limitations "for the protection of the employer in its own legitimate occupation and enterprise").

Taking this as true, it is still unclear whether the diversion of business from "any D.P. Dough restaurant" applies only to D.P. Dough restaurants open at the time the agreement was terminated or to any D.P. Dough that subsequently opens within the three-year period. If the latter, as Defendants posit, "no matter where in the world a person bound by the Franchise Agreement opened up a 'competing restaurant' that person could always be in breach of the non-competition clause because Plaintiff could always subsequently open up a store in that location." (Defs. Post-Hear. Br. at 6.) While the non-competition clause does contain a geographic

14

limitation prohibiting Southworth from opening a competing restaurant within 60 miles of "any D.P. Dough Restaurant," this language suffers from the same ambiguity as the non-diversion clause. The Court agrees with Defendants that these clauses are only reasonable if applied to D.P. Dough restaurants that are operating before Defendants begin conducting business in those locations for the restriction to properly be enforced.

As applied here, Southworth would be in breach of the non-diversion and non-competition clauses if he chose to open a competing restaurant within sixty miles of where a D.P. Dough restaurant already exists. While it is possible for the non-diversion clause to apply beyond those bounds as there is no geographic scope, there has been no evidence presented that the Eddie's Calzones in Columbia or Athens are diverting business from any current D.P. Dough restaurant. When Southworth opened his two Eddie's Calzones restaurants in Columbia and Athens, at least as of the time of the hearing, there was no D.P. Dough restaurant within sixty miles and there is still no D.P. Dough in Columbia. However, after the hearing in this case Plaintiff opened the D.P. Dough in Athens.

Plaintiff argues that even if there was no existing D.P. Dough when Southworth opened his restaurants, Southworth is still in breach of the Franchise Agreement because he knew that Plaintiff was pursuing those particular locations for development. In support, Plaintiff cites to *Stoner v. Salon Lofts, LLC*, No. 11AP-838, 2012 WL 2928671, at *1 (Ohio Ct. App. July 19, 2012), in which the Tenth District Court of Appeals enforced a non-competition clause in a franchise agreement to a geographical area where the company did not have a store but had not yet abandoned the area for development. The franchise agreement there prohibited Stoner from competing within 20 miles of a Salon Lofts "for a period of two years following the last date upon which Franchisee owns any such stores or holds the rights to develop any such stores . . ."

15

*Id.* at *3. In his role as general counsel for Salon Lofts, Stoner had negotiated at least three leases for sites in the particular city at issue and was privy to confidential company information while serving in that role. *Id.* at *4.

While the instant case is analogous to *Stoner* in that Southworth was in discussions with D.P. Dough to open a new franchise in Columbia before he opened Eddie's Calzones, this case is also different. The franchise agreement in *Stoner* specifically preserved the right of Salon Lofts to develop any such stores during the period of the non-competition provision and therefore made clear that it applied to both existing and prospective locations. The Franchise Agreement here does not include such language. Additionally, unlike Southworth, Stoner was not an individual franchise owner but part of the company's leadership and thus privy to particular confidential information regarding the development of new store locations. Apparently here, the source of Southworth's alleged knowledge was equal to that of the public since Plaintiff published such information on its public website. Stoner had also taken substantial steps towards developing the new location for Salon Lofts whereas Southworth appeared to be in the initial stages. Finally, Stoner had not actually opened any competing business before he was enjoined by the Court, whereas here Plaintiff knew for more than a year that Eddie's Calzones was operating before it sought to enforce the Franchise Agreement.

Plaintiff also relies on *Alan v. Andrews*, No. 06 MA 151, 2007 WL 1544717, at *1 (Ohio Ct. App. May 22, 2007), in which an Ohio court enforced a non-compete provision to a geographic area where the plaintiff was planning to build a permanent retail fireworks store but did not have a store at the time. *Id.* at *2. However, the non-compete agreement between the parties in *Alan* specifically prohibited the defendant from opening a competing fireworks store within seventy-five miles of either a permanent retail location or a location where plaintiff "has

16

had discussions or conducted investigations about establishing a permanent retail store." *Id.* As in *Stoner*, and again in contrast to the case at bar, the non-compete agreement in *Alan* contained explicit language indicating that its terms applied to both prospective as well as existing stores.

Ultimately, the evidence presented does not establish that Southworth was privy to D.P. Dough's expansion efforts by virtue of his position as a franchise owner. Part of Plaintiff's theory is that Southworth knew D.P. Dough was planning to expand to Columbia and Athens because of his personal knowledge as a franchise owner, which no one else would know. (Tr. at 259.) However, D.P. Dough publishes all the cities in which it is looking to open a new restaurant on its public website. Further, the evidence presented tends to support Southworth's claim that he did not know about D.P. Dough's pursuit of Athens until his realtor mentioned it, after he had already secured the lease. Therefore, Southworth's knowledge of where the company was looking to expand was not derived through confidential information gained in his role as a franchise owner.

While the restrictive covenants contained in the Franchise Agreement are reasonably tailored to protect Plaintiff's legitimate business interests, the evidence fails to establish that Southworth breached the agreement by opening an Eddie's Calzones in Columbia and Athens.

2. Misappropriation of Trade Secrets

To prevail on its state-law misappropriation claim, Plaintiff must first have proven by a preponderance of the evidence that various recipes and information in the training manual were trade secrets. *See Penetone Corp. v. Palchem, Inc.*, 627 F. Supp. 997, 1005 (N.D. Ohio 1985). Evidence of trade secret is shown by facts demonstrating the extent to which the information is known outside the business and the precautions that Plaintiff has taken to guard the secret nature of the information. *Ne. Ohio Coll. of Massotherapy v. Burek*, 759 N.E.2d 869 (Ohio 2001).

Section 1333.61 of the Ohio Revised Code defines as a trade secret "any technical information, . . . process, procedure, formula, . . . [or] program . . ." that both "derives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev. Code § 1333.61(D). Whether information qualifies as a trade secret is ordinarily "a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 707 N.E.2d 853 (Ohio 1999) (syllabus).

To prevail, Plaintiff must also establish that the Defendants acquired the trade secret as the result of both a confidential relationship and the unauthorized use of the secret. *See Penetone Corp.*, 627 F. Supp. at 1005. These requirements are set out in the statutory definition of misappropriation which includes the use of a trade secret of another by a person without the owner's express or implied consent while

> [a]t the time of ... [such] use, [the person] knew or had reason to know that the knowledge of the trade secret . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Ohio Rev. Code § 1333.61(B)(2)(b); *see also Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F.Supp.2d 853, 861 (S.D. Ohio 2008). For purposes of the statute, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Rev. Code § 1333.61(A).

The Court concludes that Plaintiffs have not come forward with sufficient evidence to demonstrate that Defendants acquired or misappropriated trade secrets from Plaintiff. Plaintiff

18

asserts that the D.P. Dough recipes, operating manual, and the information contained therein such as marketing strategies are trade secrets. (Tr. at 159.) Plaintiff also suggests that the variety of calzones and the totality of the business model in general are trade secrets. (*Id.* at 254.)

Plaintiff alleges that its recipes contain unique proprietary ingredients and that "Defendants use a near identical recipe structure that includes general ingredients for calzones as listed on menus and secret 'spice' mixes." (Pl. Post-Hear. Br. at 14.) General ingredients are the main items listed on the menu for each particular calzones, such as "breaded chicken, mozzarella, hot sauce, blue cheese" for D.P. Dough's "Buffer Zone" calzone. The "spice mixes," such as the D.P. Dough Twilight Spice Mix or Spinner Mix, are combinations of base ingredients that go into particular calzones but are not necessarily listed on the menu. The D.P. Dough Spinner Mix, for example is made up of mozzarella, spinach and garlic. (Tr. at 198.) Eddie's Calzones' "Spinner Mix" contains mozzarella, ricotta, garlic, and spinach. (*Id.*) The "Cheese Mix" for both D.P. Dough and Eddie's Calzones include mozzarella, parmesan, and ricotta. (*Id.* at 199.) Southworth further testified that his Marinara sauce contains the same ingredients as D.P. Dough's but with the addition of thyme and different proportions of spices. (*Id.* at 202–03.)

The general recipes are published on the D.P. Dough menu and thus "generally known," in addition to "being readily ascertainable by proper means." Plaintiff nevertheless asserts that it invented every calzone on its menu. While it is possible that certain ingredients combinations are unique to Plaintiff, as Judge Graham put it at the hearing, it is doubtful that "no one ever had a spinach mozzarella garlic calzone" before. (Tr. at 256.) The spice mixes are a closer call since they are not published to the public and kept more secretly than the general recipes. Though, the spice mixes are also somewhat obvious and there are differences among the parties' spice recipes, albeit minor ones. Moreover, Defendants use a different recipe than Plaintiff for their

dough, arguably one of the more important ingredients in terms of differentiating one calzone restaurant from another. Crumpton further testified that all of D.P. Dough's recipe ingredients are available on the open market and that D.P. Dough does not use any special equipment or techniques exclusive to the way it makes calzones. (*Id.* at 65.)

Even if D.P. Dough's recipes were trade secrets that Southworth learned from Plaintiff and incorporated into his own restaurant, the evidence shows that this information was not confidential or kept secretly when he learned it. The company did not keep extensive written records until after Plaintiff acquired the brand in 2011, but instead passed along the recipes and other operational information through word of mouth. Southworth first started working at the D.P. Dough in Cortland in 2007 and testified that no steps were taken to keep the company's recipes a secret at the time. Crumpton agreed that Southworth would have had access to D.P. Dough's recipes prior to Plaintiff's acquisition of the company. (*Id.*)

Crumpton instead argues that Plaintiff created valuable trade secrets for D.P. Dough after it acquired ownership of the franchise by creating written records of the calzone recipes. (Tr. at 125–26.) There is no evidence, however, that Plaintiff created new recipes or substantially changed the recipes when it bought the company. Plaintiff simply recorded the recipes that were already being used.[3] Even after Plaintiff acquired ownership of D.P. Dough, the company continued to post its recipes inside the restaurant and share them with employees who are not subject to any non-disclosure requirements.

The Operating Manual that Plaintiff developed, on the other hand, does contain certain

---

[3] Q. Okay. So, you are testifying that the recipes did not exist until you came to the restaurant?
A. They did not exist in writing, no.
Q. Okay. But the recipes themselves existed?
A. Yes, they did. That's right.

(Crumpton Testimony, Tr. at 125.)

trade secret information, such as the approved vendor list, kitchen training guide, operating instructions, inventory management, and marketing guidelines. (*See* Pl. Post-Hear. Br. at 11–13.) Southworth testified, however, that he never read or possessed the operating manual, kept one in the Cortland restaurant, or accessed any of its information through his mother or the company' intranet portal. (Tr. at 176.) On the other hand, he did say that he had the opportunity to view parts of the manual at the 2012 conference and also that he did not take any of the information because he did not find it useful. There was no evidence presented to the contrary to establish that Southworth acquired particular information as the result of a confidential relationship. Rather, as he testified, it is just as probable that Southworth gained the relevant knowledge of how to run a calzone restaurant during his time as Manager/Owner of the Cortland location before Plaintiff purchased the company and created the operating manual. Despite Plaintiff's assertions that Southworth "has effectually opened a carbon copy store, utilizing this information," Plaintiff presents no specific evidence beyond the similarity of the recipes that Defendants are using proprietary information from Plaintiff to operate their restaurants.

3. Copyright Infringement

The Copyright Act grants the copyright owner the exclusive right to reproduce a copyrighted work, create derivative works, and display and distribute copies of the work. *See* 17 U.S.C. §106 (1)-(6). In order to establish a cause of action for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 878 (S.D. Ohio 2007), citing, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copyright registration certificates are prima facie evidence of ownership in a valid copyright. *Cannon Group, Inc. v. Better Bags, Inc.*, 250 F. Supp. 2d 893, 898 (S.D. Ohio 2003), citing 17

U.S.C. § 410(c). Direct evidence of copying is rare, so plaintiffs in copyright infringement cases frequently attempt to establish an inference of copying by showing "(1) access to the allegedly-infringed work by the defendant [ ] and (2) a substantial similarity between the two works at issue." *Kendall* Holdings, 630 F. Supp. 2d at 865 (quoting *Kohus v. Mariol*, 328 F.3d 848, 853–54 (6th Cir.2003)). The "substantial similarity" factor is further broken down into another two part test: first, the court must determine which portions of the original work are truly original and protected by copyright law; and second, "the trier of fact [must] evaluate similarity from the viewpoint of the ordinary observer." *Kohus*, 328 F.3d at 854.

Here, Plaintiff alleges that Defendants copied substantial portions of the Raleigh D.P. Dough menu and has therefore infringed upon its copyrights. The Court agrees that the evidence presented establishes that Plaintiff owns a valid copyright in the Raleigh D.P. Dough menu, that Southworth had access to this menu, and that his first Eddie's Calzones menu was substantially similar to the Raleigh D.P. Dough menu.

First, Plaintiff presented copyright registration certificates for the text and photographs used on the D.P. Dough LinkedIn page and website as well as the Raleigh menu. (Copyright Registration Nos. TXu 1-946,407 and VAu 1-212-004, ECF No. 1-2.) Next, Southworth conceded that he used the Raleigh D.P. Dough menu as a template for his own restaurant and only made minor changes to the design and calzone offerings by replacing D.P. Dough's calzone names, logo, and contact information with his own. Finally, in addition to Southworth admitting that he used the D.P. Dough menu as a template for his own, a reasonable observer could easily conclude that first Eddie's Calzones menu is substantially similar if not identical in many respects to the Raleigh D.P. Dough menu. Pictured below are the Raleigh D.P. Dough menu on the left and the allegedly infringing menu on the right.

 

(Compl. Exhibits 3, 4, ECF Nos. 1-3, 1-4.)

Plaintiff also presents evidence that Defendants copied portions of Plaintiff's copyrighted text featured on its LinkedIn page and website. For example, Eddie's Calzones description of the company on its website contains a near identical paragraph to D.P. Dough's LinkedIn page except for the company name. They both read:

> [D.P. Dough/Eddie's Calzones] was founded on the simple idea that people know what they want, and it isn't always the same thing as what everyone else wants. If you're hungry (especially late at night), sometimes a pepperoni pizza just won't cut it. There had to be an exciting alternative to pizza that could easily be customized based on how you want it. The answer? Calzones!

(ECF No. 1-4.)

Although Southworth effectively concedes that he copied the Raleigh menu, he argues that the copyright owner at the time gave him permission to use the template and that he stopped using that menu and any infringing content after Plaintiff initiated this lawsuit. With respect to the first, Rick Lounsberry created the Raleigh D.P. Dough menu and owned the copyright to it

when he gave the template to Southworth in 2013. According to Defendants, it was not until May 14, 2015 that Lounsberry transferred the copyright to Plaintiff and registered the menu with the Copyright Office in July 2015. (Crumpton Deposition Ex. 10.) Defendants argue that the transfer from Plaintiff to Lounsberry for the copyright was invalid because no consideration was given. Crumpton testified, however, that Plaintiff offered Lounsberry the capacity to bring this lawsuit against Southworth for violating his copyrighted work. (Tr. at 169.) Even if the transfer was invalid and Lounsberry did give Southworth permission to use the menu, the evidence presented shows that he likely assumed it would be used for a D.P. Dough restaurant since Southworth still the owned the Cortland D.P. Dough at the time. There is also no evidence that Southworth told Lounsberry he intended to use the menu template for his new calzone restaurant. It is therefore reasonable that any license Lounsberry gave to Southworth to use the menu only extended to its use within the D.P. Dough franchise.

Nevertheless, shortly after Plaintiff filed this lawsuit, Defendants stopped using this menu design and removed all potentially infringing language and photographs from both its new menu and online presence. Crumpton conceded at the hearing that if all the purported copyrighted materials have been taken down and replaced, "the only future harm would be the lingering effect of whatever it was in the past," and that "if [Southworth] has taken it down, then . . . that takes a lot of the harm away with regards to [the trade secrets and copyright] matters." (Tr. at 163.) Crumpton further agreed that Defendants removed all infringing photographs and text.[4] Plaintiff nevertheless argues that the new menu is still a derivative of the former menu because it contains the same variety and combinations of calzones. (*Id.* at 254–55.) Plaintiff suggests that

---

[4] Q. Are you aware that all of the allegedly infringing copyright materials are no longer being used by defendants?
 A. Yeah, I mean, I am generally aware of that.

(Crumpton Testimony, Tr. at 126.)

by offering the same large number of calzones organized in categories such as chicken, veggie, and meat, that Eddie's Calzones could be confused with D.P. Dough's similar variety of calzones. (Tr. at 192–93.) Such broad categories, however, are not distinct to D.P. Dough nor are the particular categories trademarked by D.P. Dough.

As discussed further below, Plaintiff has failed to show that it has been or will be irreparably harmed by Defendants' conduct since Defendants are no longer using the infringing menu or content.

4. Trademark Infringement, Trade Dress Infringement, Ohio Deceptive Trade Practices Act, Unfair Competition

Plaintiff asserts claims for trademark and trade dress infringement under the Lanham Act, violations of the Ohio Deceptive Trade Practices Act ("ODTPA"), and unfair competition under Ohio common law. However, in its post-hearing brief, Plaintiff acknowledges that "Defendants have provided evidence that they changed their infringing works and that arguably resolves the Plaintiff's copyright and trademark claims . . ." (Pl. Post-Hear. Br. at 19.) Plaintiff nevertheless asks the Court to enjoin Defendants from any future infringement. Plaintiff also argues that Defendants' new menu continues to infringe on the D.P. Dough trade dress. To the extent Plaintiff maintains a claim for trade dress infringement, violations of ODTPA, or unfair competition, the Court finds that these claims are not likely to succeed on the merits.

Each of these claims follows the same analysis as courts apply under the Lanham Act. *Mountain Top Beverage Grp., Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 837, 839 (S.D. Ohio 2004); *see also ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) ("[T]rademark claims under Ohio law follow the same analysis as those under the Lanham Act"); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n.2 (6th Cir.

2002) ("Both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law unfair competition and the Lanham Act").

To establish liability under the Lanham Act, 15 U.S.C. § 1114, Plaintiff must show (1) that it owns a valid, protectable trademark, (2) that the Defendant used the mark in commerce and without the registrant's permission, and (3) there is a likelihood of consumer confusion. *NAACP, Nat. Office v. NAACP, Cincinnati Branch*, No. 1:15-cv-00433, 2015 WL 4164696, at *3 (S.D. Ohio July 9, 2015) (citing *Too, Inc. v. TJX Companies, Inc.*, 229 F. Supp. 2d 825, 829 (S.D. Ohio 2002)). The touchstone of a trademark claim under section 1114 is whether the Defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. *Abercrombie & Fitch v. Fashion Shops of Kentucky*, 363 F. Supp. 2d 952, 959 (S.D. Ohio 2005) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997)).

In determining the likelihood of confusion, the Court should consider eight factors: "(1) the strength of the plaintiff's mark; (2) relatedness to goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchase care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of product lines." *NAACP*, 2015 WL 4164696, at *3, citing, *PACCAR Inc. v. Telescan Technologies*, LLC, 319 F.3d 243, 24–50 (6th Cir. 2003). "The ultimate question is 'whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *NAACP*, 2015 WL 4164696, at *3 (citing *Daddy's Junky Music Stores*, 109 F.3d at 280).

Applying these factors to the case at hand, the Court finds that Defendant's use of the disputed marks is not likely to cause confusion among consumers regarding the origin of the

goods offered by the parties. Crumpton testified that he has no specific knowledge of customer confusion, but rather believes that it could be possible for customers to be confused by the fact that there is more than one late-night calzone delivery restaurant near a college campus. (Tr. at 166.) While Plaintiff purports that the entire D.P. Dough business plan is part of its trademark, the Court finds this view overbroad. Plaintiff's registered trademarks consist of various uniquely named calzones, such as the "Buffer Zone," "Roni Zoni," "Spinner Zone," and other marketing phrases such as "Hook it Up," "Pounder," and "Construction Zone." Beyond the use of such phrases or names, Plaintiff has not established that it owns the exclusive right to market late-night calzones to college campuses. Defendants' limited use of phrases such as "spinner" or "roni and shroom" in its first menu occurred when there was no D.P. Dough operating in the vicinity of Eddie's Calzones, so the likelihood of confusion is low. As discussed in the copyright analysis above, Defendants' new menu and website have removed all potentially infringing content and are sufficiently different in design now.

Plaintiff's claim for trade dress infringement also fails. "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 503 (6th Cir. 2013) (quoting *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002)).

Plaintiff argues that the D.P. Dough trade dress consists of the "red and black coloring use in its marketing and at its restaurants, and its distinctive website and menu designs, including its coloring, style, patterns, text and font." (Mot. for Prelim. Inj. at 18.) According to Plaintiff, all D.P. Dough franchises use similar coloring, menus, pictures, designs, and slogans so that its

customers can readily identify its brand. However, Defendants are no longer using the same menu design, pictures, or slogans as D.P. Dough since it updated its menu and website.

Plaintiff contends that the new Eddie's Calzones menu is nevertheless infringing because it offers the same variety of calzones, uses the same colors, and has the same general layout. Color and design may be protected as a trademark, but only upon a showing of secondary meaning—i.e., marks whose primary significance, in the minds of the public, is to identify the product's source rather than the product itself. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211–12 (2000). Here, Plaintiff has not established that its use of a red and black color scheme, common to many Italian-themed restaurants, has acquired a secondary meaning in the market. Defendants' use of a similar color scheme in the logo and website is also not used in the same manner as D.P. Dough. Plaintiff also does not own the right to offer a wide variety of calzones.

Ultimately, Defendants' operation of a late-night calzone restaurant that caters to college students and uses a red and black color scheme is unlikely to establish a substantial likelihood of success on the merits of these claims.

5. Tortious Interference with Prospective or Contractual Business Relationships

Plaintiff next asserts a claim for tortious interference with prospective or contractual business relationships. (Compl. ¶ 135–40.) However, Plaintiff fails to point to any specific contractual relationship that Southworth interfered with and does not further address the claim in its Motion for Preliminary Injunction or Post-Hearing Brief. Thus the Court is left to speculate as to the facts upon which Plaintiff bases its claim for tortious interference.

In Ohio, to establish a claim of tortious interference with a contract or business relationship, a plaintiff must show: "(1) the existence of a contract, (2) the wrongdoer's

knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Source Assocs., Inc. v. Mitsui Chemicals Am., Inc.*, No. 5:15-CV-215, 2016 WL 828785, at *3 (N.D. Ohio Mar. 3, 2016) (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). The tort involves the intentional and improper interference with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract. *Kenty v. Transamerica Premium Ins. Co.,* 650 N.E.2d 863, 867 (Ohio 1995).

Plaintiff alleges that D.P. Dough had contractual relationships with "its suppliers, employees, investors, potential franchisors, and commercial landlords," and that Southworth acted intentionally and wrongfully to deprive Plaintiff of these contractual relationships. (*Id.* ¶¶ 135–40.) To the extent that Plaintiff's franchise agreement with Bulldawg Dough to open a D.P. Dough in Athens, Georgia serves as the basis for its tortious interference claim, the Court finds that it fails or is otherwise preempted.

Ohio's Uniform Trade Secrets Act ("OUTSA") incorporates the Uniform Trade Secrets Act's displacement of "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). A claim for tortious interference with contract will generally be preempted by the OUTSA if based upon the same factual allegations. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 722–23 (N.D. Ohio 2009). The Copyright Act also preempts state common law or statutory claims where (1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§ 102, 103; and, (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001).

The only evidence that Southworth may have interfered with Plaintiff's relationship with Bulldawg is his email to Crumpton referencing his "bidding war" for the same real estate. However, the testimony shows that Southworth learned about this relationship from his real estate agent after he already secured the lease to the Athens property. In other words, there is insufficient evidence to show that Defendants learned about D.P. Dough's contract with Bulldawg before they sought to enter the Athens market. Moreover, there was no apparent breach of the Bulldawg contract, since it was able to open a D.P. Dough in Athens at a different location. Crumpton also testified that Defendants did nothing to prevent D.P. Dough from opening in Georgia. (Tr. at 158.) Accordingly, Plaintiff has failed to allege an independent factual basis to establish a claim for tortious interference, and so is preempted.

6. Unjust Enrichment

Both parties also fail to address Plaintiff's claim for unjust enrichment beyond the allegations stated in the Complaint. The Court therefore finds that it is also preempted. To set forth a claim of unjust enrichment, a quasi-contractual claim, a plaintiff must allege the following elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Source Assocs., Inc. v. Mitsui Chemicals Am., Inc.*, No. 5:15-CV-215, 2016 WL 828785, at *4 (N.D. Ohio Mar. 3, 2016) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)).

Plaintiff merely restates the same allegations of its underlying federal claims for its claim for unjust enrichment. Plaintiff alleges that "[b]y engaging in the conduct described above, Defendants have directly benefitted, including without limitation unjust benefits from their unlawful use, misappropriation and infringement of Plaintiff's copyrights, trademarks, trade

dress, and trade secrets and their breach of the Franchise Agreement . . . ." (Compl. ¶ 142.)
Accordingly, Plaintiff's unjust enrichment claim is preempted.

## B. Irreparable Harm

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). The standard requires not merely the "possibility" of irreparable injury, but instead "that irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Relatedly, irreparable injury is harm that is "actual and imminent . . . rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). "In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

Based on the record, the Court finds that Plaintiff has failed to prove irreparable injury sufficient to allow for injunctive relief. Plaintiff maintains that it "has suffered and continues to suffer irreparable harm because the intentional and unlawful acts of Defendants are causing unmeasurable loss to the Plaintiff. This damage cannot be compensated by a dollar amount and includes loss of good will, damages from unfair competitive advantage, and diluting the brand." (Pl. Post-Hear. Br. at 22–23.)

Defendants first argue that Plaintiff is not irreparably harmed because it unduly delayed in bringing this action after discovering Defendants' alleged infringing activity. Crumpton

confirmed that he first discovered that Southworth had opened Eddie's Calzones in Columbia in April 2014, but that he did not have the time or resources to investigate beyond a brief online search. (Tr. at 74–75.) While Plaintiff asserts that it "made reasonable efforts for a business of his size to ascertain if the existence of 'fast Eddie's Calzones' was accurate and could not find anything," Crumpton undermined this to some extent by stating that "I was just aware that he was open." (Pl. Post-Hear. Br. at 21; Tr. at 100.) Plaintiff's next communication with Defendants was on April 25, 2015 when Southworth emailed Crumpton regarding the parties' "bidding war" over real estate in Athens, Georgia, at which point Plaintiff initiated this suit three months later on July 21, 2015. Defendants argue that Plaintiff would have taken swifter action if it was truly being harmed. The Court agrees at least to the extent that D.P. Dough's failure to investigate further after learning Southworth had opened Eddie's Calzones in Columbia does not demonstrate the irreparable harm that would warrant injunctive relief.

Next, Defendants argue that "any notion of irreparable harm is also mitigated when the defendant ceases the allegedly infringing conduct upon notice from the plaintiff." (Defs. Post-Hear. Br. at 2 (citing *Kendall Holdings*, 630 F. Supp. 2d at 866–67). Irreparable harm is generally presumed where the Court finds a copyright has been infringed, *Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 WL 2144599, at *7 (S.D. Ohio May 31, 2011), but it may be rebutted when the defendant desisted the infringing activity upon notice from plaintiff, *Kendall Holdings*, 630 F. Supp. 2d at 868. While Plaintiff successfully established the likelihood of success on the merits of its copyright claim as to the first Eddie's Calzones menu, Defendants have ceased using that menu. Defendants presented evidence that all allegedly infringing marks, copyrights, and other intellectual property has been removed from Eddie's Calzones new menu and online presence. As discussed previously, Crumpton agreed with this fact at the hearing. During the

period of time in which Defendants were still using the infringing menu, there was no D.P. Dough within sixty miles that would have been harmed. Defendants had already switched to their new menu design before the D.P. Dough in Athens, Georgia would open. Accordingly, Defendants have successfully rebutted Plaintiff's likelihood of success on this claim by showing that Plaintiff will not face irreparable harm by Defendants' use of the previous menu.

Plaintiff nevertheless argues that Southworth's Columbia restaurant is a "knock-off model" of D.P. Dough that tarnishes the reputation of Plaintiff. (Tr. at 101–02.) However, there is no D.P. Dough in Columbia or within sixty miles of the city, so it is unlikely that Plaintiff would be harmed by its operation. While Plaintiff may directly compete with Eddie's Calzones in Athens now, Eddie's Calzones was already operating there before Plaintiff opened its Athens D.P. Dough. By removing the allegedly infringing content from their new menu, Defendants and their business will not likely be confused with Plaintiff in the Athens market, so any potential harm will be there result of normal competition.

## C. Harm to Others

Defendants would necessarily suffer harm if the requested preliminary injunction is issued because it would require Defendants to close the Columbia and Athens restaurants for three years. Defendants' Counsel informed the Court that Eddie's Calzones employs approximately 35 employees who lose their jobs, although those figures were not supported by additional evidence. Plaintiff argues that Eddie's Calzones experiences regular turnover of its staff, many of whom are students, such that their employees would likely be able to find part-time or temporary employment elsewhere.

## D. Public Interest

The public has an interest in seeing that reasonable restrictive covenants are enforced.

*Bierdeman*, 786 N.E.2d at 920 ("Preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest."). However, the public is also served by fair competition, which provides consumers with greater choices. Since the Plaintiff has not established a substantial likelihood of success on the merits on most of its claims, the public interest does not favor restraining Defendants' activity.

## III.    CONCLUSION

Balancing these four factors, the Court concludes that Plaintiff is not entitled to a preliminary injunction. While Plaintiff established that Defendants copied the Raleigh D.P. Dough menu, there is no irreparable harm since Defendants are no longer using that menu. Accordingly, Plaintiff's Motion for a Permanent Preliminary Injunction (ECF No. 4) is **DENIED**, and judgment is entered in favor of the Defendants.

**IT IS SO ORDERED.**

9-26-2017
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**